Good afternoon. May it please the Court, Stuart Lev on behalf of Appellant James Lambert. Before I begin, as I was preparing for the number of issues we have before the Court today, it struck me that perhaps it would be more helpful to the Court if we broke up the argument and argued the guilt phase issues first, then had the Commonwealth respond, and then the penalty phase. If that's more helpful to the Court, I'd be happy to proceed that way. If the Court would rather go through the whole proceeding, we can do it that way. What would you prefer? If counsel for the appellee agrees, that's fine with me. That's fine with us. All right. Okay. In that case, I would like to take about 15 minutes of my time to talk about the guilt phase issues and save two minutes of that time for a rebuttal of the guilt phase issues. All right. Will you be reserving rebuttal time on the penalty phase as well? Yes, I'll reserve a minute for the penalty phase rebuttal just in case. I suspect we'll be very hot and exhausted by the time we get to that level of the argument. James Lambert was convicted of first-degree murder and sentenced to die on the basis of some of the weakest evidence imaginable in a capital trial. The only evidence connecting him to this crime was the testimony of an admitted accomplice who received extraordinary benefits and privileges in exchange for his testimony against Mr. Lambert and the testimony of an eyewitness who had told the police at the time of the crime that she did not see the perpetrators, that she was not able to provide a description, that she would not be able to make an identification. But suddenly at trial, when called to testify by the co-defendant, not by the Commonwealth, 18 months after the crime, she for the first time made an identification. It's utterly lacking in reliability. The issues, the guilt phase issues, other than the Batson claim that I'm not sure we'll get to today, the other guilt phase issues go directly to these two key pieces of evidence and undermine these two key pieces of evidence and also demonstrate how the trial court's rulings on these issues were rulings made in order to protect the fair trial rights of the co-defendant, Bruce Reese, at the expense of Mr. Lambert. And for the number of reasons expressed in the brief that I hope we get to talk about today, I think Mr. Lambert is entitled to relief from this trial. I do want to make sure, because there are so many issues,  and so I know this court will direct me to the areas that you're most concerned about during the course of the argument. I was going to start with the Brady claim. The first part of the Brady claim deals with a police report that was not disclosed to trial. The police report indicates that the accomplice witness, a man by the name of Bernard Jackson, had named Leonard Woodlock as his co-defendant in this case. And that as a result of that information, the police had taken Mr. Woodlock's photo and put it in a photo array and taken it out to the bartenders at the lounge where the crime occurred and showed that photo array to them, but they were not able to make an identification. You will agree, will you not, that the federal defender did not cover itself in glory as to how it came into this material and how it came to be disclosed? I would agree that it was problematic. We thought we were acting properly at the time. We were told later by Judge Keogh and state court that we were not. We immediately followed Judge Keogh's orders and stopped doing what we were doing. But I think that the key element here is that we shouldn't have to engage in tactics to have this evidence disclosed. The problem is this type of police report naming another person as the co-defendant should have been disclosed from the get-go. Would you think that this police identity sheet would be as material as you say it is here if the evidence had been stronger in this case? It certainly, if there was more evidence, it would be less materiality. I think materiality is something that we balance against what the impact of the non-disclosed evidence might be against the evidence in the case. But in this case, given the overall weakness of the Commonwealth's case, and remember the Commonwealth's only evidence was Bernard Jackson and he was testifying for an agreed deal that was told to the jury and perhaps other benefits that we allege. And he had given a number of statements and made a number of inconsistent statements and admitted to a number of lies that he had told the police. He was not a stand-up witness to begin with and yet there was one area of his testimony that the Commonwealth relied on over and over again to try to make him credible to the jury and that was his supposed consistency in naming Mr. Lambert as his co-defendant in this case. Lambert and Reese. Lambert and Reese. Lambert and Reese. And so, and he presented that through direct testimony, he argued that to the jury. The one thing you can depend on Bernard Jackson that he was consistent is that he named Lambert and Reese as the people and he didn't. Right, this police report tells us that he named Leonard Woodlock. Competent defense counsel, and remember as this court has said in Simmons and its other Brady cases, we look at the nondisclosed evidence through the eyes of competent defense counsel and how competent defense counsel could have used this evidence to attack the credibility, create other inferences for the jury. And competent defense counsel could have used this evidence in any number of ways. It's evidence perhaps that Leonard Woodlock was the person who committed this crime with Mr. Jackson, one of the people who committed the crime. It's evidence that Mr. Jackson is just looking for a scapegoat who would stick. Somebody remember, Jackson was identified, the only identification by any of the people in the bar to the police during their investigation. The only identification was one bartender who identified Jackson as one of the robbers in the bar, the one who stood by the front of the door during the robbery. Jackson's telling the story that he's not even in the bar, that he's outside in the car during the course of the robbery. And so Jackson's clearly mitigating his behavior, trying to minimize his responsibility and his behavior in this case. And he's looking for a scapegoat. And the fact that he. . . I'm sorry, where in the record does one of the barmaids identify Jackson as the man at the door? I believe that was the testimony of Sarah Clark. Yeah, and Marie also says it looks something like. . . There's a suggestion that she was identifying. . . That's right, Marie Green was the other bartender. There were two bars, one at the front and one at the back. The shooting occurred at the back. And Jackson had stood at the front, by the front door of the bar. Did they identify Jackson by name? My recollection is that he was 5'6", and he had dark glasses and a hat. They identified Jackson from a photo array shown to them by the police during the police investigation. Can you suggest in your reply brief, and let me just ask you if you meant you're suggesting, the prosecutor knew about this identification of Woodlock and knew therefore that Jackson was testifying falsely when he said it was only Grease and Lambert? Is that correct? Did the prosecutor know about this? I can't say for sure. I think certainly the prosecutor had constructive knowledge. Well, constructive. This is a police report that's in the police homicide file. And certainly the prosecutor under Kyle's, under the Supreme Court law, is duty-bound to know what's in the police homicide files and investigations. But I don't think there's anything on the record that shows that he had one way or the other whether he had actual knowledge of this. What do you say? You would agree that in order to grant relief here, we would have to find that the state court's determination that this was not material was an unreasonable application of Brady, right? Yes, I would agree with that. And what they said was that this was an extensive investigation, and in the context of that extensive investigation and all the reports and the statements, et cetera, this single mention of Woodlock, if anything, suggests that nobody, that Woodlock was not a serious subject. The police did not regard Woodlock as a serious subject. And they say, yes, he could have been, this material could have been used to cross-examine Jackson, but there was just so much material that he could be cross-examined with and was cross-examined with that this is not something that would cause anyone to lose confidence in the verdict. Well, I think it's unreasonable. I think that's unreasonable, Judge Stapleton, for two reasons, particularly. First, because I think part of the defense theory, Mr. Lambert's theory, was that Jackson was looking for a scapegoat, that it was Jackson and Reese who did this crime together, and that Lambert, who had just met Jackson and Reese earlier that day, had nothing to do with the crime. And certainly this mention, which the police took seriously enough to put into a photo array and take it out to the bartenders to show them, was a key piece of evidence that the defense didn't otherwise have to support the idea that it was a scapegoat, that Lambert was being scapegoated. And the Pennsylvania Supreme Court didn't really deal with that. They only really dealt with the materiality as it affected the possibility that Woodlock was actually the robber. They didn't really deal with the scapegoat. But I think even more persuasively and more importantly, and the Pennsylvania Supreme Court doesn't address or deal with this at all, is the prosecutor's evidence and argument about the consistency of Jackson's identification. The consistency of Jackson's identification was the cornerstone of the prosecutor's defense of Jackson's credibility. He repeated it several times in closing argument, and he brought it out during the course of his examination of Mr. Jackson. That was the cornerstone of his otherwise very damaged witness. He was trying to save that consistency of who he identified as his co-perpetrators. Now this leads neatly into, I'm going to move you along a little, into your argument about the 12 or 13 other bar robberies committed by Reese and Jackson without, you say, Lambert, and your objection to the fact you weren't allowed to go into them. The Supreme Court described those robberies as a hodgepodge. They said a hodgepodge of conflicting facts. That some were committed by Jackson alone, some by Reese alone. Some by Jackson and Reese where Jackson was just going to drive the car. Others by Jackson and Reese with a third party. My question to you is how many of these 12 or 13 prior bar robberies were committed by only, by Jackson and Reese together? I think it was about eight. I'm not sure exactly, but it was about seven or eight of them were committed by Jackson and Reese together. But here's one of the problems, Judge Barry, I think, in the state court's determination of that. From the very beginning, when defense counsel first raised this issue at trial and wanted to use it, and the trial judge says, I don't see that they're similar enough to use against Reese, defense counsel asked for a hearing so that they could go through and present evidence and look at these prior robberies, look at the facts of these prior robberies, and demonstrate that there was a sufficient degree of similarity for at least many of them, that it ought to be admissible. And the judge denied a hearing. And the hearing issues were raised again on direct appeal. They were raised in PCRA litigation. On direct appeal they challenged the court's failure to hold the hearing in PCRA litigation. Those sides, we again challenged the court's failure to hold the hearing, and we've asked for a hearing in federal court as well if the record doesn't support a new trial, which I believe that even on this record it does. At the very least, he's never had a hearing. So the Pennsylvania Supreme Court is basing that decision without ever having a fact-finding opportunity where you could take evidence and conduct discovery and determine whether or not there were a number of these robberies that had a sufficient degree of similarity. Assuming there was a fair number that were similar, and they certainly, if they were, if the crimes were similar and Jackson and Reese did them together, you might draw the inference that they were the ones that were involved here. But help me, how do you draw an inference if Reese and Jackson did a whole series, you can say, well, they probably did this one. But how is it logic to say that it's evidence that Lambert was not there? The fact that these two did a series of crimes, why is it relevant to show that your client was not there? There were two people in the robbery. There were two people inside the bar committing the robbery. The only person who suggested that there were three people in this crime was Jackson, who was minimizing his own conduct, perhaps. All the witnesses in the bar, they saw two people. They saw one person stand by the front door, and that was the person who was identified by the barmaids as Jackson. And they saw another person go to the back, who was ultimately the shooter in this case. And that person, if described at all by Janet Ryan, the eyewitness that we'll talk about in a little bit, was described as somebody 5'5 or 5'6, somebody consistent with Reese's height. So if you look at this evidence, this similar acts evidence, this pattern and practice of Jackson and Reese committing robberies, in light of the other evidence of who was in the bar, it's completely consistent with the defense that Lambert wasn't there and that this robbery was committed by them. I mean, you would argue, as opposed to evidence he wasn't there, the inference you would argue was inescapable, that if there were 13 or 12 prior bar robberies with just the two of them without Lambert, that he wasn't there at this time. Absolutely. And we bear in mind in arguing this that at trial, the defendant's burden is only to create a reasonable doubt. And certainly the inference compared plus the evidence that already exists on the record creates some substantial doubt about whether Lambert was here, was in the bar at the time of this crime or not. And that's what the defense needed to present it. The defense doesn't have to prove it wasn't Lambert. They just have a trial to try to raise a reasonable doubt before the jury. Well, the doubt seems to me rises or falls based upon the jury's appraisal of Ryan's and Jackson's credibility. And, I mean, are we supposed to second-guess that? Well, I think we have to look at two things. I think we have to look at did the jury have the information that they should have had to be able to make a fair assessment of Jackson's credibility. And so that information, we allege, is that police report naming Leonard Woodlock. We think the misleading nature of what was told to the jury would be Jackson's deal and Jackson's benefit versus what the prosecution actually did in that case takes away from the jury information that they should have had or the jury was misled. And as to Ryan, the difficult question is not so much her credibility but her reliability. And if we get to the identification issue, the U.S. Supreme Court has recognized that in some limited circumstances, identification testimony is so unreliable that even cross-examination is not effective to be able to fairly present it to the jury. The problem, Judge Hardiman, that I've always seen with trying identification cases is the witness isn't lying. Cross-examination is a great tool to help uncover questions about the credibility of the witness and whether they're being truthful. But the problem with identification witnesses is most often they believe that what they're testifying is true. The problem is what science told me and what the U.S. Supreme Court recognized many years ago in the series of identifications is what they believe is not always reliable and not always something that we want juries to rely on to be able to judge because juries really have a difficult time judging the reliability of identification testimony in extreme circumstances. All right. But accepting all that, I mean, the Supreme Court of Pennsylvania on direct appeal held it was not an abuse of discretion to deny the severance motion and it was not error to allow Ryan to be called as a witness by Mr. Cannon who was representing Reese. Where is the Supreme Court of the United States decision telling us that either of those two decisions by the Pennsylvania Supreme Court was contrary to clearly established Supreme Court precedent? Let's start with the identification testimony from Ms. Ryan. What the Pennsylvania Supreme Court said and it's quoted in the brief. I'll paraphrase it now. They said, in court identification by a witness who was unable to previously target a defendant is clearly admissible. That was their holding. That holding is in conflict and certainly an unreasonable application of the Pennsylvania, the U.S. Supreme Court holdings that have set forth a procedure for determining the reliability and admissibility of identification testimony. What case? Manson versus Braithwaite, Neal versus Diggers, Stovall versus Deno. Manson and Neal, they're factually opposite to the fact that this case? I don't think there's a case. I want to be clear. I don't think they're a case where the admissibility came from a co-defendant rather. But I don't think that's not important in judging the reliability and admissibility. I mean, I don't doubt that Ryan's testimony is admissible for Reese. It benefits Reese and Reese needs it to protect his fair rights. But the question isn't, was it admissible for Reese? The question is, is it admissible to be used against Lambert? And Manson and Diggers and the whole trilogy of cases tell us that you have to subject identification testimony when it's the product of a suggestive confrontation with some care and that there's a series of factors to determine reliability. Manson says reliability is the linchpin of admissibility. And there's not a single factor in this case that gives you any hope that there's any reliability to Janet Ryan's identification. I didn't mean to interrupt you because you're going to run out of time. I really need help with this, the cases that you're referring to, because we read them somewhat differently. I understand your argument that if you apply the Diggers factors, you can't justify this on the basis that its reliability is independently established. But my understanding of the Supreme Court cases is that you first have to look whether an identification's circumstances were unnecessarily suggestive. That's before you ever get to can you independently justify them by independent evidence of reliability. So the first step before you get anywhere is, one, was it suggestive? And two, is there any justification, fair justification, for not having taken a less suggestive means? In Stovall, that was the whole case. That was the whole case. They never got to Diggers where Diggers hadn't been decided. But they said they took this defendant to the hospital where the victim was there, and the court said, well, that was necessary under the circumstances. She was the only one that could absolve him, et cetera, et cetera. I'm not sure how your rule would work here when we're talking about the necessity of a public – well, first of all, the only thing suggestive here with the in-court identification was that he was sitting at counsel table with four other men, five men sitting at counsel table. Now, we know that the Supreme Court is going to say a public trial is constitutionally required. We know the Supreme Court is going to say confrontation of the defendant, of all the witnesses by the defendant, is constitutionally necessary. And – oh, right to counsel. Now, isn't it – how do you have a public trial guarantee that the defendant has constant contact with his attorney and that he is able to confront all of the if you say that this identification under these circumstances is unconstitutionally inadmissible? I would answer you, Judge Stapleton, with these thoughts. First, I read Manson and Biggers a little more broadly than that. When Manson says reliability is the linchpin, I think it's any circumstances leading up to the ultimate identification creates suggestivity that then reliability becomes the critical factor. But let's assume that we read it the way you do. And I'd say at first let's talk about suggestiveness. I don't see – there's little doubt that a trial setting is a suggestive setting. The defendants are sitting at the courtroom with counsel. It's pretty easy to distinguish counsel from defendants. They're sitting there at the table. The witness comes in to the courtroom and she knows that there's a trial going on and that these men are accused of doing what she was a part of, what she was a victim of. And so her attention, the suggestivity is there both in the knowledge that she has going into it and in the look itself. There's also suggestivity here that's a little unclear. But the prosecutor said at one point after Ms. Ryan had finished her testimony that she had been shown photos. And he wasn't sure who she was shown photos of, but she knew she had been shown photos before. If there had been a hearing, if the judge had given them a hearing, you would have had a hearing whose photos were shown. We might have been able to figure that out. But, again, when defense counsel said a little belatedly I should have asked for a hearing, the judge says that's okay. I wouldn't have allowed that anyway. No, he did ask for a – the prosecutor asked for a pretrial hearing and the judge turned him down. Well, pretrial, there was never any question. A hearing when she testified. Before she testified and the judge turned him down. I've never heard of a procedure like this. You've discharged the witness. That's right. That's right. And so it is suggestive and it is unreliable. And so then the only question then is unnecessarily. And I would suggest – Hold on. If it's suggestive, just because it is suggestive does not make it as a matter of law unreliable. No. It has to be impermissibly suggestive, doesn't it? Well, I think – And if it's not impermissibly suggestive, isn't reliability for the jury? No. That's the whole problem with eyewitness identification at some level. That there has to be some minimal level of reliability established through the bigger factors before we let the jury hear it. Because there's such a potential, such a danger of misidentification. But the bigger stuff was the trial where there was a pretrial identification and the taint didn't come into the trial. The whole identification here occurred at trial. In front of the jury. In front of the jury. That's correct. But here's what I think is unnecessarily, what makes it impermissible or unnecessary. Certainly the trial is permissible and the right of the public and the participation of counsel is all permissible. The trial should not be permissible as an identification setting. If you're going to use a witness as an identification witness, there ought to be some measure of that witness's ability to make an identification before that witness comes into the courtroom, into that very suggestive setting. You predict that the Supreme Court of the United States is going to bar all courtroom identification? No. And I'm not saying that. I'm saying that when you have a courtroom identification that's objected to, that's in a situation where you can ask for a hearing, where there's evidence of reliability, courtroom identifications are fine. But where there's no evidence of reliability, we can't depend on juries just to be able to take an identification made 18 months after the crime and understand the questions about reliability. Because we know from social science, we know from DNA exonerations, we know from the case law that juries are impacted by the witness who sits up there and says, that's the man, I'm sure of it. What's the difference between reliability and the weight that should be accorded an identification? I think reliability is a threshold standard of admissibility. And then weight is a question for the jury. I understand weight's a question for the jury, but don't you think there's quite a bit of interaction between them? There may be. But if they were identical, then the Supreme Court never would have said, some identification shouldn't come in. They would have just said, the reliability of an identification is the subject for the jury. The Supreme Court hasn't said that. The Supreme Court says there are some identifications in some circumstances that don't meet a threshold standard of reliability that we allow it to go to the jury. And I suggest, although these are somewhat unique, not unique, these are not the ordinary type of identification problems that we run into, that the whole circumstances of this are so unreliable that it should not have been admitted to the jury, that it's too unreliable for the jury to credit and to reach a verdict that we can depend on. My time is up. If you want a few more minutes, feel free. This is an important case. I would like to do a couple of things with just a couple more minutes. One is to emphasize, I think, that there are a number of issues here that if you don't believe we've established that relief should be granted in the form of a new trial, that at least an evidentiary hearing is called for. I think the Brady claims call for an evidentiary hearing if it's not sufficient on its face to grant a new trial. The question of similarity of the prior act's call for a hearing. And hearings have been requested. They were requested in state court at each stage of post-conviction litigation. They were requested in the court below on hearings on these kinds of material facts where the state court didn't develop the record, and perhaps even on the identification. But let me talk briefly about the severance, because Judge Hardiman, that was the other question. I think it was either you or Judge Stapleton asked about the Pennsylvania Supreme Court's ruling on the severance. I think I would say... My point, to help you a little, my point is let's assume for a minute that if I or perhaps my colleagues were presiding over this trial, and the Janet Ryan thing, I think we can all agree, was a rather odd development in the middle of this trial. Assume for a minute that I would have at that point said, I know I denied the severance motion before. Now we're in a different world. Now we need to sever it. So this isn't a question about whether severance was a good idea or a bad idea. I'm saying under AEDPA, where is the Supreme Court case on point that tells us that the Pennsylvania Supreme Court's decision in that regard was contrary to law? Okay. And I would answer that in two ways again. First, I would say I don't believe that applies here, because it is not at all clear that the Pennsylvania Supreme Court decided the severance case on the basis of a federal due process claim, such as the one we raised in post-conviction litigation. Well, the argument on appeal was it was an abuse of discretion. It was couched as a state court evidentiary violation. It was couched as a state court evidentiary violation. It did cite to the Eighth Amendment. It did cite to the case of Tifford versus the United States, and a Fifth or Eleventh Circuit case that's cited in our brief that applies a due process analysis to a severance. And so certainly the federal claim was not well-developed on direct appeal. All right. But if AEDPA applies, what's the case? Okay. If AEDPA applies, I think the case is Lane and Zafiro that are both cited in our briefs. And Lane was a case where the – Zafiro's 93, isn't it? Yeah, 93 or 96. And when was the PA Supreme Court's decision on direct appeal? It's 92, 94. Before Zafiro, wasn't it? I don't think so. No, it was after Zafiro? I think it was after Zafiro, but I know it was after Lane. Lane was 86. It was 92. So it might have been before Zafiro. So they can't be faulted for not having a crystal ball and anticipating Zafiro. No, but then you take the general principle set forth in Lane that says, you know, there are some instances where the denial of severance renders the trial fundamentally unfair, that it violates the Fifth Amendment due process. With Lane, okay. So I think it would be Lane, and the question is, was the trial rendered so unfair by that circumstance that it violated due process? And was it unreasonable to find anyway? And I think under these circumstances, it was. And Zafiro comes along later and explains why it was, because not only do we have antagonistic defenses in this case, where we have Lambert trying to say it was Jackson and Reese who did this crime, not me, and Reese saying it wasn't me, I wasn't involved, but we have antagonistic evidence, both in the similar acts testimony that was precluded because of its impact on Reese and because of the identification from Jackson. And I think those factors really do render this trial fundamentally unfair. The Batson issue is really very complicated procedurally. It's well briefed by both sides, and unless the court has questions on the Batson issue, I'll certainly rest on the brief on that. Thank you. With one second thought, if I may, the Batson issue, I want to be clear that we're only asking for an evidentiary hearing on that claim. We're not suggesting that relief should be granted, only that a hearing should be granted. Mr. Goldwurtner. Good afternoon, Your Honors. My name is Joshua Goldwurtner. I represent the Commonwealth of Pennsylvania's official nominal party respondents, the FLEs. The petitioner's Brady claim has two parts I'd like to address. Before we get to the Brady claim, we'll get to each of the discrete legal issues. I'm going to ask you a question, and I debated as to whether I should ask it, but I'm going to ask it. If you want to pull that microphone over in front of you, please, so we can hear you. Are you, the editorial you, comfortable with the fact that a conviction for first-degree murder and a sentence of death can rest on the testimony of a Bernard Jackson and a Janet Ryan? I understand the question, Judge Barry, and I'd like to answer that in the context of answering the question about the Brady claim with respect to Bernard Jackson's testimony and about the police activity sheet. I mean, the evidence that was presented to the jury was the evidence that was presented to the jury, and with respect to the identification of Janet Ryan, the facts that supposedly make the identification so unreliable were exactly the facts that were presented to the jury. But to address the Brady claim first, if I may, there's two parts to it. There's the first Giglio claim about the deal with Bernard Jackson. Mr. Lev didn't really go into that. Perhaps you should deal with the other half of it. Okay, very well. The state supreme court ruled unanimously that this piece of evidence wasn't material, and the state court's ruling on this claim was not unreasonable, and I can give an illustration as to why. Now, we know the petitioner himself gave a statement to the police after he was arrested in May of 1983 and after he stopped falsely claiming that his name was John Maul. Now, the fact that he gave the statement to police came into evidence, although not the substance of it. There was this back and forth about whether or not the substance of the statement could come in, where the judge initially held that it could come in if the petitioner's lawyer was foolish enough to bring it in, and then the judge held that on further consideration that it was out, even though none of the attorneys seemed to be arguing that it should come in. I think that if the petitioner tried to make, based on this police activity sheet, this third-party guilt argument that Woodlock was really the third person or that Bernard Jackson can't even make up his mind about who was with him that night. No, no, there's no question. Bernard Jackson was very clear who was with him that night. It was Reese. No, well, no, I understand that, but the claim is that this piece of paper, this police activity sheet, could have been used to show that somebody else committed the crime or that Bernard Jackson can't even make up his mind about who the other person is besides Reese. And if they had made that argument a trial, I think we'd be hearing a claim of ineffective assistance of counsel right now because the substance of the petitioner's own statement to police, which is discussed in Volume 7 of the appendix at around pages 2950 to 2960, would have come in. Jackson was impeached 11 ways to sundown. There is nothing, there is nothing that he wasn't impeached. He told so many stories, he even admitted that he was totally inconsistent in what he had said. I understand. Wouldn't this, that for the first time, and in total contradiction, with the one thing the prosecutor admitted, he was consistent, the prosecutor said in summation, that it was Reese and Jackson all the time. Could this third-party ID have been the nail in Jackson's credibility coffin? No, Judge Barry, I don't believe so, and I believe the state court's adjudication was reasonable, and the reason I'm saying that is because if they had argued this at trial, that this piece of paper proves that it's either- They didn't have it. No, I understand that, but the question is, what could counsel have done with it? That was the argument the petitioner was making. That's the argument. And I'm going to say that in that case, and I should say, this trial was back in 1984. If this were tried today, there's no question that a document like this would be produced to the defense. You'd turn it over. Pardon me? You'd turn it over. Of course we would, and I think at this time, documents like this weren't even routinely provided to the prosecutors. Now, I understand, as well as the next person, that for purposes of Brady, the prosecutor is treated as if he knows whatever the police know, whether or not he actually knows it. But that's only part of the claim. Part of the claim is that the prosecutor intentionally and knowingly lied and intentionally made false arguments and intentionally- No, no, I think Mr. Levin said that's not really their argument. Okay, okay, because that was raised in their brief. Well, it was a hint. I understand that. But the district court didn't even deal with it. The district court dismissed it summarily, didn't refer to Woodcock, Woodblock by name, and didn't even refer to the police activity, the October 25th report. And he just disposed of it in two sentences, actually. Well, I think the district court said that it would require considerable amount of speculation to even assume it. But he didn't mention either the arguments of the defendants, actually, or the name of Lawrence Woodblock, or anything to do with the police activity sheet of October 25th. And I'm pointing out, just by way of illustrating the reasonableness of the state court's decision on the materiality of this, that if they had tried to make this, that this piece of paper proves that this fellow Jackson is, you know, that the real person is Woodlock where the Jackson can't even keep his story straight about who person number three is, at that point the prosecutor is going to say, you know, all bets are off. We're going to bring in the petitioner's own statement to police in which he concedes number one. I don't understand that argument. I think, speaking only for myself, we should move on to some of the other points that perhaps I can understand more easily. Do you have any more questions on the Brady point? No. No, I'm content. Why don't you move to the next issue? Okay. With respect to the identification claim, based on what I've heard here, I mean, not only was the state Supreme Court's decision not contrary to Supreme Court precedent or otherwise unreasonable, the rule the petitioner is arguing for here would be a new constitutional rule, I mean, violation of Teague, even if AEDPA didn't exist. I mean, not only no Supreme Court case has ever held that the proper remedy, much less the constitutionally required one, is blocking an in-court identification when there's no substantial risk of irreparable misidentification from prior added-court identification or when you've had an in-person show up in violation of the defendant's rights to counsel. But what about the severance? Shouldn't the trial judge have realized that they had entered a different realm once the Janet Ryan situation unfolded because it did? I don't think the context in which the identification was made has any constitutional significance. I think that for our purposes, constitutionally, there's no significant difference than if the judge had just told the prosecutor, okay, you can recall Janet Ryan. I mean, I agree that the trial court's decision to say, well, prosecutor, you can't recall her just because she's already left the stand, but co-defendant, you can call her, I agree that's idiosyncratic and I think actually wrong. But I think as a matter of constitutional significance, I think it's the same as if the judge had said, okay, you can recall this Janet Ryan to the stand and she can be cross-examined about this, including why she didn't say anything before and about the circumstances under which she's seen. It's a little more than that. I mean, she got a glance. This is the first. Let's go through her testimony. She glanced, but she didn't see. And he was 5'4 to 5'6. This is the first. She didn't know who it was. But she was visibly upset on the stand. There's the break. The prosecutor says to her, why are you upset? She said, I think the guy who had the gun is in there. Where's that fact? And they put her back on. Now, all of a sudden, she has gotten a look at him. She saw him at the stairs. But she also confirms that he's 5'7 and she identifies Reese at 5'7. That's her testimony. In fact, she says, he's shorter than 5'7 because she was behind the bar and it was lower. And the man with the gun was at the other side of the bar and it was higher. So she was looking up. So he appears taller than he is. So he's about 5'5. And then the question is asked, how tall is Mr. Reese? Is Mr. Reese 5'7? And she says, yes. And, of course, Lambert is 6'1. This is the witness that puts the gun in Lambert's hand. Right? Yes. But all of this was before the jury and the constitutional rule that the petitioner is arguing for. You have to keep going back to the Constitution because that credibility is speaking only for myself. The weight given to her testimony in my judgment is zero. I understand that. If you have the Constitution, you can hold up. Right? And say, as a matter of constitutional principles, you prevail. Tell us why. I mean, the Supreme Court case of Watkins v. Souders, which the petitioner cited in his brief for Justice Brennan's dissent, although not the majority opinion. The majority holds that even if an out-of-court in limine ruling on identifications is desirable, it isn't constitutionally required. There's no reason why you can't do this in front of the jury. And, in fact, if the question is just one of the reliability of an identification, that's one of the things that juries do, and that we expect juries to be able to do as instructed by the court. I mean, the constitutional rule that just says some identifications, even without a prior out-of-court ID, even without a waive violation, are so unreliable that it must be kept altogether away from the jury. I mean, that is not what the Supreme Court has thus far held the Constitution has required. And if they were to say such a thing, if they were to establish such a rule, it wouldn't apply to cases under collateral review. I mean, I can – the question – I mean, our issue that was briefed in this case is, you know, was the state court's ruling on this contrary to Supreme Court precedent, or a reasonable application of Supreme Court precedent? And on that, I'm confident the answer is no. I mean, and that's the question before the court. I guess I'm an old trial judge at heart, and I say – I look at whether or not, as a matter of fundamental fairness, this conviction should stand and this sentence should stand. And I look at Jackson's testimony. I mean, Jackson was royally impeached. First of all, he's got – the murder weapon was the 38, yes? Yes. Jackson says Reese had it the night of the shooting. The 38 was Reese's. Jackson's story is all over the place. And Lambert had only the 32. This is consistent testimony. He never had the 38 the night of the shooting, all right? You've got the barmaids identifying the shooter as being 5'7 or less. You've got Jackson saying, Reese told me he shot two guys. Then Jackson says, Reese told me that Lambert shot. And then he tells us, the jury, what Lambert supposedly said to Jackson. But he said, that was a lie. I was making that up. I was trying to save myself. This plus Janet Ryan's testimony is what we have before us, seeking the affirmance of the district court, the conviction for first-degree murder and a sentence of death. And I think, Judge Barry, that was part of the reason why I was arguing in connection with the Brady case, that just as the U.S. Supreme Court held Nwange v. Balmontes, it's not good enough to say, well, the defense could have done this and then assume that the rest of the world is static. You have to think about how this would... Nobody can read, though. Nobody can read, in my judgment, speaking only for myself, can read the testimony of Bernard Jackson and the cross-examination and the testimony of Janet Ryan and the cross-examination and come away, and I speak only for myself, with a feeling that justice was served here. That's all. That's the end of my piece. If I could briefly address the severance claim. With respect to the severance claim, I mean, first, for the reason stated in my brief, I don't think the FIRA is a federal constitutional case establishing any rule that's applicable here. It's a federal rules case in which the case actually stands with the proposition that there's a strong preference in favor of joint trials. And as far as the United States v. Lane goes, I mean, that's, again, a federal rules case in which the U.S. Supreme Court, the issue was can a misjoinder in a federal rules be harmless error. Various federal courts of appeals had held no, it can't be. And the Supreme Court granted certain, said they can be, and in this case it was. And, in fact, what the Supreme Court actually said in this case was usually the issue of misjoinder isn't a constitutional question at all. And then there's a footnote in there that says it would only be a constitutional issue if you were talking about fundamental fairness. But I don't see how that establishes, how that is a holding of the Supreme Court that, you know, that is, you know, that the state court's decision on severance can be argued as an unreasonable application of. If the court has no further questions as to the bill, please. Thank you. Thank you again. I don't have much to say in reply on the guilt phase issues. I would simply emphasize here that all of the concern that Judge Barry expressed as your personal opinion I think goes into the materiality questions of the Brady. That's why this police report that maybe in some other cases where there was overwhelming evidence or strong evidence of guilt might not require a new trial in this case because there's so little confidence in the reliability of the jury's verdict from the get-go, let alone all of the kinds of significant constitutional concerns and errors we've raised here. I mean, the district attorney, I know we have an EDPA standard, but we know things were wrong here. The district attorney just told us that he didn't think Brian should be allowed to testify for the co-defendant and that this paper would have been turned over. These are not just mistakes. These are serious constitutional questions that impact our reliability and undermine any confidence we could have in the reliability of this verdict. And so a new trial really is appropriate. You led off today with your Brady issue, and it's the first point in your brief. Is that, in your view, your strongest issue? I don't mean to— I have to tell you, probably I think so, but I had a very difficult time deciding which I think are the strongest issues in the case because I think particularly the Brady issues, the preclusion of evidence about Jackson and Reese's conduct together, and the identification issues are also critically important issues going right to the heart of this case. And then the severance kind of is an umbrella that takes a lot of that into account, that it's a very hard question for me to answer as to which is our strongest issue. You said you were asking only for remand for an evidentiary hearing on the Batson matter. Where and when specifically did you request a— or did your client request a hearing in the state court, an evidentiary hearing in the state court? Explicitly in PCRA litigation. Now— Which PCRA? The Batson was raised in the first PCRA, which would be Lambert 2. And it's those pleadings, I believe, that are in our supplemental— I think the Batson issue, as opposed to Judge Stapleton's request, and he can certainly speak for himself, was where did you specifically request an evidentiary hearing on the Batson issue? In the PCRA litigation, at the PCRA trial level and on appeal. But I would also say about this, Batson was raised on direct appeal, abysmally. And I think if the court looks at the brief, you know, it's raised a year and a half after Batson's decided and doesn't cite the Batson. There's a part of the argument that doesn't even deal with jury selection, that deals with non-capital sentencing. It doesn't make any sense. And yet, if the Pennsylvania Supreme Court had followed what the U.S. Supreme Court did in Batson, which is when, before Batson was decided, a Batson claim was raised at trial and there wasn't any factual development of the record, the proper remedy was to remand for a hearing. That's what the Supreme Court did in Batson. They didn't grant relief. They remanded for a hearing because they set forth this new standard. New standard applies to Lambert. By raising the claim, he should have gotten a hearing then. But we certainly specifically asked for it in PCRA. Let me go on to the penalty phase, because in some ways the penalty phase lacks the same kind of confidence that the guilt phase has. And most of that involves the circumstances in which there was no mitigation evidence presented and no argument made. So let's talk first about what happened there, and then we can talk about the instructional issues that I think are very prevalent. Now, how much time, excuse me, did you? I think I reserved, I think there was 12 minutes left, and I would reserve one minute, I think I said, for penalty phase rebuttal. Because the clock has the red light on it. I'm just curious as to the timing. I have to tell you, Judge Barry, I have really bad eyesight, and I can't even see the light that well anyway. Now it's green. I just keep talking to you. Tell me to stop. Well, you know, I assume the court has the timeline. After the verdict, Mr. Lambert was emotionally distraught. He was angry. He was frustrated at the verdict that came in about Janet Ryan's testimony. And for the first time, defense counsel had been planning on presenting mitigation. He'd been planning on calling the defendant's sister and telling about his family history, telling about his military service in the Coast Guard, his honorable discharge for medical reasons, the mental health and drug abuse problems that he had after his discharge. But the defendant, for the first time, suddenly demanded that counsel present no evidence and make no argument on his behalf. And counsel went to the court and said, Mr. Lambert doesn't want me to make argument and doesn't want me to present evidence because he feels he's innocent, he's been wrongly convicted, he feels Bruce Reese was the shooter, and he thinks that I'm part of the conspiracy that led to his conviction. And so the trial judge brings Mr. Lambert in and starts asking Mr. Lambert not about that decision, but about whether he wants to testify or not. Mr. Lambert says, yes, I'd like to say something to the jury. Defense counsel objects. Defense counsel says, that's not why we're here. Mr. Lambert shouldn't testify before the jury. He's temperamental. His temperament might show through. I don't believe it's in his best interest. He shouldn't testify. The judge says to Mr. Lambert, well, you've heard what your lawyer says. Do you want to testify? And Lambert says, no, I'll change my mind. Then the judge says, well, your lawyer has also told me you don't want to present evidence or have him make argument. Is that correct? Lambert says, yes. Then after a little bit of discussion about a possible jury instruction, defense counsel, using a profanity, and if you've read the entire trial or your staff has read the entire trial, you know that defense counsel often use profanity and truly uncivil and inappropriate language, usually outside the presence of the jury throughout this case. But clearly defense counsel has his own hot-headedness problems. The judge says, you don't want your lawyer to do that. Lambert says, that's right, I don't. Judge says, fine. And so then we have a penalty phase hearing where if there's no evidence presented, the prosecution simply incorporates the guilt phase of the trial. Defense counsel makes no statement to the jury other than to say, decide the case as you want. And the only argument to the jury comes from the prosecutor. It's a bit to the court that that creates a constitutional problem as to whether Mr. Lambert made a knowing, intelligent waiver of his right to present mitigation evidence. But your friends will tell us that that's not a constitutional right. There is not a constitutional right to present mitigating evidence. And they'll give us the name of the case that says it. I know what it is. Scherrero v. Landry. Yes. That's right. But Scherrero didn't say there was not a constitutional right. Scherrero was a case where the court applying AEDPA deference, it was an AEDPA case, and they had to give deference to what the state court had done and the findings of fact that the state court had made, was determining whether or not it was proper for the federal court to grant an evidentiary hearing on the question of trial counsel's ineffectiveness in his failure to properly investigate evidence of mitigation. That was the issue in Scherrero. It's not the issue in this case. Scherrero didn't decide whether or not there's a constitutional requirement of knowing intelligent waiver. That wasn't the issue before then. And they were paying deference to the state court. Here, let me start off with the standard of review. In this case, your review of this issue is a de novo review because the Pennsylvania Supreme Court did not address the merits of this issue. This issue was raised on the first PCRA in post-conviction. That would be Lambert II. That's the opinion that produced that fractured result with two judges offering an opinion announcing the judgment of the court and three judges concurring and two judges dissenting. There was no common grounds. If anything, the opinion announcing the judgment of the court dismissed this claim on procedural grounds, finding it was waived because it wasn't raised on direct appeal. And, of course, that kind of procedural ruling would not be an adequate and independent default because direct appeal at the time of the waiver occurred during the relaxed waiver time in Pennsylvania, and your honors are all aware of the body of case law that says that that's not an adequate and independent default. So there's no merits. Maybe we ought to establish first what the issue is here. You say it wasn't a knowing and voluntary decision not to offer mitigating evidence, but you don't claim, and I don't understand there to be any evidence in the record, as to what Mr. Lambert knew or didn't know about mitigating evidence. My understanding of your argument is that the constitutional requirement of knowing and voluntary means that the court has got to conduct a colloquy and give the necessary advice and make a determination as to whether it is knowing and voluntary. Am I right about that? I would say mostly right. I would simply expand on that to say I think in any type of claim where the question is what's required for a knowing and intelligent and voluntary waiver, the court looks to the totality of the circumstances. So I think you can look at certainly the colloquy is a critical part of that, and we emphasize that strongly. But I think the court looks to the totality of the circumstances, including Lambert's temperament, his state of mind at the time of the waiver, his mental health history, all the evidence that the court knew about at the time, is fair to take into account to determine the voluntariness of the waiver. Didn't we hold in U.S. v. Penny Cook, and didn't the Supreme Court say in Landegan, that there is no duty of the court to address on the record and advise regarding the exercise of the right to testify? I think you did say that. I don't think that's what the Supreme Court said in Landegan. In Landegan it was talking about the right to offer mitigating evidence, which is even more on point, but it wasn't holding. And what the majority said in that case is, again, they were applying it at the standard. They said there's no clearly established federal law. And then in the very next paragraph they go on to even assume that there was such a rule, was such a requirement, that that requirement was met in this case. And so there was no reason for the federal court to have to hold an evidentiary hearing. Where do you draw the line? Where does your principle draw the line? I mean, you have a constitutional right to put on a defense. A defendant does, of course. And occasionally defendants do not put on, after the government is all through, they do not put on a defense. You're saying the Supreme Court's going to hold that the judge has got to go, hold on, hold on a minute, no, no, we're going to have a separate hearing here, and we're going to address all of this and what the effect might be of your decision not to put on a defense. The Supreme Court's going to hold that? No, no, I don't think so. What's the difference? Where do you draw the line? What's the distinction between this case where he's electing not to put on mitigating evidence at the penalty phrase and the situation where the defendant elects not to put on a defense? I think the distinction is in the fact that it's penalty phase, that to use a colloquialism that's constitutionally based, death is different, and that penalty phase hearings, because of the Eighth Amendment and the Eighth Amendment's requirement of reliability, that the Eighth Amendment requires heightened standards of reliability in a penalty phase situation. I think the other difference, Judge Stapleton, is the decision to put on a defense is a decision that at trial is entrusted to the lawyer. We know it's ultimately the lawyer who gets to dictate what the defense is going to be. It's the lawyer who gets to determine what they're going to argue to the jury in closing. That's a lawyer's decision, not a defendant's decision. Defendant can testify, but he can't insist that a lawyer put on a certain defense. I think it was, this isn't in our brief, we're stepping a little aside, but I think it was Florida v. Nixon, the Supreme Court case, where there was a claim of ineffectiveness because a lawyer had conceded defendant's guilt of a lesser included offense, and defendant challenged that. Didn't even consult with his client. Stood up there and told the jury his client was guilty, trying to lay the groundwork to avoid the death penalty. Right, and the Supreme Court said that was permissible for counsel to do. Here. Because that was counsel's choice. So we get to the Eighth Amendment, and it becomes the defendant's option, for reasons I quite frankly don't completely understand, but the defendant's option is to dictate the presentation of mitigation or what counsel can say to a jury. Just as a decision as to whether he's going to testify or not. Just as a decision. How do you distinguish Pennycook then? Because Pennycook is a guilt-based trial-level case in which those decisions are left to, except for the decision to testify, which is personal, the other decisions are left to trial. But we did say in Pennycook that there's no duty of the trial court to advise regarding taking the stand. But certainly there's a body of law, as I understand, and I'm not very versed in federal criminal procedure, of ineffective assistance of counsel cases where counsel misled the defendant about his right to testify and that there are other challenges that go through to that. But the point that I want to come back to is I think the fact that it's a death penalty proceeding, that it's the Eighth Amendment that's involved, that the issue here is life and death, that it becomes the defendant's issue, makes this very different than Pennycook. And that's where I would draw the line. I would draw the line very cleanly between trial and a capital sentencing. Let me, I know I don't have much time. You don't have any time. But you can give us one sentence, a long one if you want. The Caldwell claim, what distinguishes this, like we relied heavily on Riley in our brief, and I know Judge Barry and Judge Stapleton, you were both on the dissent of Riley. But I think you should find in this case it's different than Riley because the critical thing to the Caldwell claim to me is what, in Riley, Judge Alito's opinion relies on that it was just mere acknowledgement of the right to appeal. And what the jury was told here by the trial judge is much more. The jury is told that not only that there's a right to appeal, but in addition to the Pennsylvania Supreme Court's authority to correct errors, that the Pennsylvania Supreme Court will decide whether to affirm the sentence of death or to vacate and remand for the imposition of a life sentence. Now, that goes way beyond what was said in Riley. It actually goes way beyond what was said in Caldwell. It tells the jury in that plain language that the Pennsylvania Supreme Court's going to be the ultimate arbiter of what sentence is appropriate here. And that's why it's a Caldwell violation. And that's why, although I respect your dissent in Riley, I think not only because of stare decisis, but because of the differences between this and Riley, that this is a much more offensive instruction than the argument in Riley and really does raise to the level of a Caldwell. Thank you, Mr. Lynch. Thank you. Your Honor, it's important to recognize this is not one of those cases in which the claim is, and we have cases where this is what's alleged. The counsel simply didn't prepare for the penalty phase until the night before because it just didn't occur to him that the jury would actually find the petitioner guilty of first-degree murder. This is a case in which defense counsel is obviously preparing to present evidence and argument that would paint a sympathetic, albeit highly sanitized and incomplete portrait of the petitioner. Well, let me ask you this question. You and the district court seem to deal with the knowing and intelligent question this way, that he didn't say he doesn't say now he didn't know. Therefore, we will assume he did know that if he doesn't put on mitigating evidence, he'll get the death penalty automatically because two of the aggravators were beyond dispute. Well, Judge Barry, I mean, the Supreme Court has been clear that even when you're talking about waivers of things like the right to appeal or even the right to go to trial altogether and to plead guilty, there's a difference between direct and collateral review. And on collateral review, it's not enough to say you had a bad colloquy, not just in U.S. versus. See, there we go again. Now we're into the standard of collateral review, which is, you know, probably is what we have to apply. But I'm telling you, where is there anything that says he knew he was going to die? He would get the death penalty. As a matter of law, if he doesn't put on anything, given the way this case was presented, he dies. Your Honor, we have a presumption of attorney effectiveness. And given what this attorney was planning to put on, it is difficult for me to imagine that counsel didn't tell his client. See, that's what I mean. You're saying it's difficult to imagine counsel didn't tell him that he was going to die. Oh, boy, that's tough. Your Honor, but there's no allegation or suggestion to the contrary. That's what I said before. No, but, Your Honor. Because there's no allegation that, therefore, it must be so.  He knew that he was going to die. Judge Barry. You know, maybe at that point he didn't care. Maybe he needed a cooling-off period. Maybe after this verdict came down on the testimony of Bernard, Jackson, and Janet Ryan, maybe there should have been a cooling-off period before they immediately went into this. Judge Barry, the petitioner has asked for an evidentiary hearing and a chance to make the record on a number of claims, but not this one. But not this one. This is a claim in which his sole claim is because the record doesn't show it, you must assume that he didn't know. And that is the exact argument that the Supreme Court, and even U.S. v. Timrec, which deals with the waiver of all trial, said is insufficient for collateral review. In fact, in an en banc case this court took shortly after U.S. v. Timrec where the person pleaded guilty and said there wasn't a good colleague that told me what the elements of the crime were that I was pleading guilty to. It came up on collateral review on 2055, and unanimously this court en banc held, are you alleging that you actually didn't know? Because if you're not saying that because...